718 P.2d 1001

**AMERICAN SAVINGS SERVICE CORPORATION, an Arizona corporation, Appellant/Plaintiff/Counterdefendant,**

v.

**Masaaki and Miyoko KOSAKA, Gary J. Engelbrecht and Lacy M. Ehneking; Lee E. Purnell; Frank E. and Lorraine R. Wolfenberger; First Service Corporation, an Arizona corporation; Robert A. and Carolyn R. Putt; Erik R. Pfanku and W. Scott Quesinberry; Cathy A. Whetstone Arford; Kwan Bian Cheng; Timothy J. Flood; Walter Paul and Gertrude J. Colwell; David L. and Joan L. Eerkes; Warren B. and Audrey M. Saufferer; Perry T. Johnson; Richard W. and Annamaria Kelly; Joyce Cutchall; Park and Richye Dana and Jack Dana; John W. and Rosemary Goss; Annette Stamoulis; Arthur E. and Patty Y. Kunz, Jr.; William H. and Margaret C. Stewart; Ceco, Inc.; Noyco, Inc.; M.W. and Elsie M. Johnston; Yeoh Eu Hock; Stephen E. Hisey; Gray McInroy; Gordon K. Reese; Timothy M. Kelly; David L. and Barbara S. Earnest; Christopher William Zell; B.F. Tensing; Patrick E. Kelly; Denny E. and Elva R. Bram; William Barbour, Jr.; Corito S. Tolentino; Joyce M. Siebeck; Michael and Susan Johnston and Gary W. and Paul J. Johnston; Gordon J. and Hazel R. Root; Jack T. and Dorothy C. Arnold; David R. and Joan M. Frazer; and George W. Guirl, Jr.; George W. Guirl, Jr.; Thomas C. Tucker; George W. Guirl, Jr.; and William Selby, Appellees/Defendants/Counterclaimants/Crossclaimants,**

v.

**William SELBY, Appellant/Crossdefendant.**

**Masaaki and Miyoko KOSAKA, Gordon J. and Hazel R. Root; William Barbour, Jr.; David L. and Joan L. Eerkes; Arthur E. and Patty Y. Kunz; M.W. and Elsie M. Johnston; Christopher William Zell; Gary J. Engelbrecht; Cathy A. Whetstone Arford; B.F. Tensing; Thomas C. Tucker; Park and Richye Dana and Jack Dana; Michael and Su-**

san Johnston and Gary W. and Paula J. Johnston; Richard W. and Annamaria Kelly; William H. and Margaret C. Stewart; Gordon K. Reese; Lacy M. Enneking; First Service Corporation; Robert A. and Carolyn R. Putt; Timothy J. Flood; Walter Paul and Gertrude J. Colwell; Mary B. Suafferer; Perry T. Johnson; Joyce Cutchall; Gray McInroy; Denny E. and Elva R. Bram; and Jack T. and Dorothy C. Arnold, Appellees/Plaintiffs,

v.

TUCSON RACQUET & SWIM CLUB, INC., Appellant/Defendant.

No. 2 CA–CIV 5434.

Court of Appeals of Arizona, Division 2, Department A.

Nov. 27, 1985.

Review Denied April 29, 1986.

Waterfall, Economidis, Hanshaw & Villamana, P.C. by John C. Rambow, Tucson, for appellant/defendant Tucson Racquet & Swim Club and for appellant/crossdefendant William Selby.

Christoffel & Zickerman, P.C. by Herman C. Zickerman, Tucson, for appellant/crossdefendant William Selby.

Winston & Strawn by Michael F. Rollins and Paula S. Bickett, Phoenix, for appellant/plaintiff/counterdefendant American Sav. Service Corp.

Chandler, Tullar, Udall & Redhair by Steven Weatherspoon, Tucson, for appellees.

## OPINION

BIRDSALL, Presiding Judge.

This appeal is from the trial court's finding that the appellants' attempt to reserve development rights in certain common areas of a condominium was ineffective and contrary to Arizona's horizontal property regime statute.

The appellants are American Savings Service Corporation ("American Savings") and Tucson Racquet and Swim Club, Inc. ("Tucson Racquet Club")—formerly joint venturers—and William Selby, owner of a condominium unit which the appellees claim is part of the common elements of the Racquet Club Condominium. The appellees are owners of condominium units within the condominium.

On December 20, 1979, appellant American Savings filed a quiet title action in Pima County Superior Court against the appellees. The complaint sought a declaration that American Savings, throughout its joint venture with the Tucson Racquet Club, created "development rights" which were properly reserved in the various documents of the horizontal property regime. The appellees thereafter filed a counterclaim against American Savings seeking a declaration that the appellees, as unit owners and together with other owners, were the sole and exclusive owners of all the common elements within the condominium and that the appellants had no right to develop any portion of the common elements.

On May 1, 1980, the appellees filed a quiet title action in Pima County Superior Court against the Tucson Racquet Club. The complaint was identical to the counterclaim against American Savings. On July 12, 1982, the appellees filed a crossclaim against Selby as owner of the disputed Unit 45. The crossclaim sought a declaration that Unit 45, which was formerly the caretaker's dwelling, was part of the common elements of the condominium.

These actions were consolidated. On March 11, 1985, the trial court granted the appellees' Motion for Partial Summary

Judgment, holding that the joint venture's attempt to create and reserve certain development rights within Racquet Club Condominium was ineffective under the horizontal property regime statute. The court further held that the creation of Unit 45 was null and void and that an agreement terminating the limited partnership of the unit owners and the joint venturers did not constitute a release or waiver of interest by the appellees or a granting of an interest in the horizontal property regime by the appellees to the appellants.

## FACTS

In late 1972, American Savings and Tucson Racquet Club formed a joint venture, known as Racquet Club Ranch Resort, to develop certain real property as the Racquet Club Condominium. To this end, the joint venture acquired two parcels of land adjacent to the Tucson Racquet Club. Parcel I already contained approximately 55 buildings. By 1973, the 28 newest of those buildings had been converted into 44 condominium units and the remaining buildings, except for the caretaker's house, were demolished. The joint venture planned to construct another 74 units on Parcel I. Parcel II consisted of an undeveloped 55-foot strip of land on which the joint venture planned to build 44 units. Parcel II remains undeveloped.

While still sole owner, the joint venture executed a Declaration of Horizontal Property Regime and a Declaration of Covenants, Conditions and Restrictions. These documents, along with a Plat covering the 44 units on Parcel I, were recorded in Pima County on February 13, 1973. The Declaration of Horizontal Property Regime stated that all owners of units shall be members of the council of co-owners and subject to the bylaws promulgated by the council. On February 27, 1973, the joint venture, still the sole owner of all 44 condominium units, executed, adopted, and recorded the bylaws. The bylaws provide in part:

"XII.A.2. *Buildings and Improvements to be Constructed*

Declarant may construct additional Buildings containing units on the Land, provided, however, that no more than seventy-four (74) new and additional Units shall be contained in additional Buildings constructed on Parcel I described on Appendix A hereto, and no more than forty-four (44) new and additional Units shall be contained in additional Buildings constructed on Parcel II described on Appendix A hereto. Other structures and facilities which Declarant, in its sole discretion deems to be in the best interest of the Racquet Club Condominium or the Racquet Club Ranch Resort rental operation may be constructed upon the Land until such time as a final amendment to the Declaration, designated as such, has been recorded.

B. *Units*

The Unit number and Common Element Percentage Factor of each of the initial forty-four (44) Units are set forth in Appendix B to the Declaration, which shall be amended from time to time to reflect the Unit numbers and the new Common Elements Percentage Factors of all Units existing from time to time as a result of any increase in the total number of Units resulting from additional Units constructed or to be constructed upon Parcels I and II....

C. Declarant reserves the right to alter, modify, build upon or change all Common Elements, both General and Limited, pursuant to Declarant's right to construct additional Buildings containing Units or other improvements, as provided in Paragraphs A and B of this Article XII, until such time as a final amendment to the Declaration and final Plat, both designated as such, have been recorded. Prior to recordation of such final amendment and final Plat, no person whatsoever shall have any right to object to or in any way contest any alteration, modification, or change to any of the Common Elements, whether General or Limited, resulting from, caused by or in connection with Declarant's rights and privileges (i)[sic] to construct additional Buildings containing Units or other im-

provements pursuant to this Article XII, or (2)[sic] to amend the Declaration pursuant to Article XII hereof.

\* \* \* \* \* \*

XX. *Amendment*

A. Until and including December 31, 1977, each person who may become an Owner of any Unit does hereby irrevocably appoint Declarant as such Owner's agent to execute such amendment or amendments to the Declaration, the Covenants and these By-Laws, as Declarant, in its sole discretion, may deem to be in the best interest of all of the Owners of all of the Units contained in the Racquet Club Condominium. The agency created hereby is non-revocable and constitutes a power coupled with an interest so long as Declarant shall be an Owner of any Unit in the Racquet Club Condominium. The agency hereby created shall be binding upon the heirs, executors, personal representatives, administrators, successors and assigns of all Owners of all Units within the Racquet Club Condominium until and including December 31, 1977."

On May 4, 1973, before any of the units were sold, the joint venture recorded the first amendment to the bylaws. The amendment replaced paragraph D of article XII relating to the computation of common element percentage factors which establish the unit owners' undivided interest in the common elements. The amendment fixed the sales price of each unit sold thereafter at $32,950 and provided that, as new units were constructed, the common element percentage factors would be computed by taking the "percentage which the sales price of such Unit bears to the aggregate sales price of all Units (whether or not sold) in the Racquet Club Condominium...." With the sales price of the additional 118 units fixed, the effect that those new units would have on the first-phase unit owners was established before the first unit was sold.

In addition to the bylaws, the joint venture executed a Certificate of Limited Partnership and recorded it on February 28, 1973. The purpose of the limited partnership was to manage the leasing of the units so as to make a profit for the limited partners. The joint venture was to serve as general partner and, as each new unit was sold, the new unit owner would become a limited partner.

Between May 14, 1973, and November 12, 1973, the joint venture sold 42 units and their corresponding interests in the limited partnership. The joint venture retained ownership of two units. Because the units were designed as an investment vehicle, each unit was sold by means of a prospectus to eligible purchasers. The prospectus described the filing of the horizontal property regime and the plat, and set forth the existence of the covenants and bylaws. The prospectus provided further:

> "The By-Laws provide that up to 118 new and additional Units may be constructed in the future upon the land included within the Racquet Club Condominium.
>
> \* \* \* \* \* \*
>
> In the event any additional units are constructed upon the property which is presently or which may in the future become subject to the terms of the declaration, the percentage ownership in the common elements of each purchaser of an existing Unit will be reduced to reflect the additional common element ownership interest of purchasers in newly constructed Units. The resulting modification of common element ownership will be based upon the percentage which the sales price of each Unit (both existing and newly constructed) bears to the aggregate sales price of all Units (both existing and newly constructed). [Emphasis added.]

Upon purchase of a unit, the limited partner purchaser signed a "Condominium Deed" wherein he agreed to be bound by all provisions of the declaration of horizontal property regime, the declaration of covenants, conditions, and restrictions, and the bylaws.

Each purchaser also signed an affidavit and a special power of attorney. The affi-

davit constituted an acknowledgment by each purchaser that he had received a copy of the declaration, covenants, bylaws, first amendment to the bylaws, limited partnership agreement and the first amendment to that agreement, and a copy of the prospectus. The special power of attorney appointed the joint venture as the unit owners' true and lawful attorney to execute and amend the declaration, covenants, and bylaws. The power of attorney also provided that it was coupled with an interest and was irrevocable until the limited partnership was terminated. All these documents were recorded.

As of December 1977, the additional phases had not yet been constructed. On December 29, 1977, the joint venture adopted and recorded a second amendment to the bylaws extending the joint venture's power to amend the declarations, covenants, and bylaws and extending its power to add additional units on Parcels I and II through January 1, 1981.

In 1978 the joint venture (as general partner) decided to terminate the limited partnership and agreed to give each limited partner $1500 in cash, a membership in the Tucson Racquet Club, and a one-year waiver of dues in the club in exchange for the limited partners' execution of the following agreement:

"a. To execute such further instruments as reasonably may be required to carry out the purposes of this settlement including vesting in the general partners without reservation all development rights.

b. That, after completion of the settlement provided for herein, such limited partners shall have no right, claim, title or interest in the right to develop the additional units on condominiumized property.

c. That the general partners, their officer, directors and stockholders, and each of them, are released from every claim or cause of action now existing or hereafter arising, known or unknown, in connection with the subject matter of the limit-

ed partnership, this agreement and the real property involved.

d. This agreement requires acceptance by all limited partners unless the general partners agree otherwise."

This agreement was executed by all limited partners and by the joint venture on May 5, 1978, and copies were recorded in the Pima County Recorder's Office on July 20, 1978. Three or four of the appellees were limited partners and signed the termination agreement. All of the other appellees acquired title to their units subsequent to the termination of the limited partnership.

In June and July of 1978, the owners of 31 of the 44 units executed first amendment to the declaration of covenants, conditions and restrictions and third amendment to the bylaws. That amendment, which added an additional unit known as Unit 45, provided:

"The building in the common elements known as the Caretaker's House, located northwest of Unit 1 and northeast of Unit 6, shall be considered and deemed to contain an additional Unit on Parcel I under the provisions of this Subparagraph XII(A)(2), and shall be deemed to be a "development right" until the recordation of the Amendment to Declaration and Plat to establish the numbered Unit."

Paragraph XXI of the Covenants provided that they could be amended by a written instrument executed by 66-⅔ percent of the voting power. This amendment was executed by Tucson Racquet Club, owner of six and one-half units, American Savings, owner of nineteen and one-half units, and by the owners of five other units. These units constitute 70.5 percent of the voting power of all unit owners.

On May 24, 1979, the joint venture executed the first amendment to the declaration of horizontal property regime, which provided in part:

"NOW, THEREFORE, the undersigned owners of real property constituting part of the Horizontal Property Regime join in the creation of Unit 45 from the common elements of the Horizontal Property

Regime, which unit is more particularly described as follows:

RACQUET CLUB CONDOMINIUM Unit # 45, according to the Map or Plat thereof recorded in the office of the County Recorder, Pima County, Arizona, in Book 30 at Page 94."

On June 11, 1979, the appellees as unit owners, and not the joint venture, adopted a second amendment to the declaration of covenants, conditions, and restrictions and fourth amendment to the bylaws of Racquet Club Condominiums. This document was recorded in Pima County on June 13, 1979. The purpose of the amendment was to revoke all bylaws and amendments thereof, to delete the joint venture's development rights and power of amendment, and to integrate the amended covenants with the new bylaws and original declaration.

In December 1980, the joint venture executed both the second and final amendments to the horizontal property regime. The second amendment created 10 of the 44 additional units mentioned in the original bylaws for Parcel II. The final amendment created 73 additional units on Parcel I and recalculated the common element percentage factors. Because this was to be the final amendment of the joint venture and the bylaws would allow no further development of Parcels I and II by the joint venture, the percentage factor was permanently fixed in the final amendment.

At the time the first, second, and final amendments to the horizontal property regime were executed, neither American Savings nor Tucson Racquet Club owned any of the units of Racquet Club Condominium. This action arose when American Savings attempted to exercise the development rights it claims to have reserved.

### ISSUE ONE

The creation of a condominium under Arizona's Horizontal Property Regime Statute requires the execution and recordation of a declaration of horizontal property regime which contains a detailed description of the property, any then-existing units, and all common elements. It further requires that the declaration contain the percentage interest that each unit owner has in the whole and that a council of co-owners adopt bylaws, rules, and regulations to be made available to every owner. A.R.S. §§ 33–551 to 33–561; see also 23 Ariz.L.Rev. 483 (1981).

When the subject property was submitted to the horizontal property regime, the joint venture was the sole owner and thus the sole member of the council of co-owners. As such, it adopted and recorded bylaws which, inter alia, set forth the joint venture's future development plans and reserved to the joint venture the right to construct any additional units which it should deem appropriate "until such time as a final amendment to the Declaration, designated as such, has been recorded."

■ The appellees argue that the reservation of development rights contained within the bylaws contravenes Arizona's horizontal property regime statute in several ways. First, the appellees argue that because the statute does not expressly provide for the reservation of development rights, such rights cannot exist. The cardinal rule of statutory construction is to ascertain, if possible, the intent of the legislature. *City of Phoenix v. Superior Court,* 139 Ariz. 175, 178, 677 P.2d 1283, 1286 (1984). We doubt seriously that the omission of development rights in Arizona's horizontal property regime statute was an intentional prohibition of such rights. For some evidence of this we can look to the newly adopted condominium act, effective January 1986, which specifically provides for the reservation of development rights. Unlike the new act, which is very detailed and complete in its terms, the act which governs here is very brief, providing a bare-bones approach to condominium ownership which, we believe, was by no means intended to prohibit or exclude anything not set out therein.

■ The appellees also argue that the only ownership interests provided for under the statute are in units, general com-

mon elements, and limited common elements and that, by reserving development rights, the appellant is attempting to create a third kind of property right not provided for by statute. We disagree. The development rights were reserved. The subsequent conveyances to the appellees were subject to that reservation. This was not the creation of some new kind of property right.

■ The condominium bylaws adopted and recorded when the appellants were still sole owners and made available to each purchaser specifically reserved to the appellants "the right to alter, modify, build upon or change all Common Elements." Furthermore, the condominium deed executed by every original owner provides: "By acceptance of delivery and execution of the Condominium Deed, Grantee hereby agrees to be bound by ... each and every and all of the terms and provisions of those certain By-Laws of Racquet Club Condominium...." The development rights constitute an exception to the grant made to each original unit owner, an exception acknowledged and agreed to by the original purchasers. Because the bylaws were recorded, any subsequent purchaser is held to constructive, if not actual, notice of the contents. A.R.S. § 33–416.

■ The appellees further argue that the reservation of development rights is contrary to the statutory requirement that a unit owner's percentage share of the common elements may not be modified without his consent. The development and subsequent purchase of additional units, it is argued, would keep this percentage factor in constant flux so that an owner would never know what he owned and a purchaser would not know what he was buying.

While we agree with the appellees that uncertainty in law is anathema, the facts show that the appellants addressed the risk of uncertainty before the first unit was sold. Article XII, paragraph A, subsection 2 of the bylaws places an upper limit on the number of units to be built. Article XII paragraph D and Article XX of the bylaws

establish a method of computing the new common element percentage factors for each existing and for any additional units created. The first amendment to the bylaws, adopted and recorded while the appellants were still sole owners, fixed the sales price of each new unit at $32,950, allowing potential buyers to determine the fractional percentage of ownership appurtenant to each unit if *all* the authorized units were built. The development rights having been excepted from each conveyance, the percentage interest accompanying those conveyances must be based on the assumption that those rights will be fully exercised. Thus, the percentage interest of the common elements which is appurtenant to each unit is the percentage interest which would exist if all proposed units were in fact built. We believe the formula utilized by the appellants provides sufficient certainty to satisfy the statute.

■ The appellees next contend that the bylaws were not the proper document in which to reserve development rights. Rather, they argue, the bylaws are intended to address maintenance and similar matters and the declaration is the appropriate document in which to establish a property interest.

A.R.S. § 33–561 provides:

"A. The council of co-owners shall be required to make provisions for maintenance of common elements, limited common elements where applicable, assessment of expenses, payment of losses, division of profits, disposition of hazard insurance proceeds and similar matters *and* shall be required to adopt bylaws, rules and regulations." (Emphasis added.)

This section of the statute sets forth duties which the council of co-owners are required to perform. It does not, as the appellees argue, limit the contents of the bylaws to the enumerated provisions.

Moreover, Arizona case law recognizes that the rights and obligations of condominium owners with regard to the common elements may be found in three sources—

the statute, the declaration, and the by-laws. *Makeever v. Lyle,* 125 Ariz. 384, 609 P.2d 1084 (App.1980); see also 23 Ariz. L.Rev. 483 (1981). In *Makeever,* one of the unit owners wanted to add a second story and a basement to his single story unit. After receiving the approval of 10 of the 16 unit owners, he began construction. Other unit owners filed suit to enjoin the con-struction, arguing that it constituted a wrongful appropriation of portions of the common elements for his sole and exclusive use. The trial judge ruled for the defend-ant and held that a vote of the majority of the council was sufficient. The Court of Appeals reversed, holding that

> "the power of the council of co-owners to actually convert the common general ele-ments to the exclusive and private use and control of one of the individual own-ers constitutes a taking of the other re-maining individual owners' property which must be clearly given by the stat-utes, declaration of submission or *bylaws* before its existence will be recognized." 125 Ariz. at 389, 609 P.2d at 1089 (em-phasis added).

There is no dispute that at the time these bylaws were adopted the appellants were the sole owner. Inasmuch as they re-served the development rights in the by-laws and recorded them, we hold that the appellants have an enforceable property right to develop the additional units within the horizontal property regime. Accord-ingly, the trial court's judgment denying the existence of the rights as reserved in the bylaws is reversed and the trial court is directed to enter judgment in favor of the appellants.

## ISSUE TWO

Finally, the appellees argue that Unit 45, formerly the caretaker's house, is part of the common elements and, as such, can be withdrawn from the common elements only by a unanimous vote of the co-owners. They further contend that the amendments to the bylaws and declaration which cre-ated Unit 45 were ineffective because 1) they received less than a unanimous vote, and 2) the appellants were not unit owners at the time one of the amendments was voted on.

■ If the appellants had chosen not to exercise their development rights, we would agree that the caretaker's house was part of the common elements. A.R.S. § 33–551(6)(d). But the appellants did choose to exercise their rights. We held above that the appellants' reservation of development rights was proper and in ac-cordance with Arizona's horizontal proper-ty regime statute. We hold here that the creation of Unit 45 was proper for the same reasons. It is irrelevant that the amendments were adopted by less than 100% of the owners, just as it is irrelevant that the appellants owned no units when the second amendment was adopted. The bylaws as originally adopted, even without the subsequent amendments creating Unit 45, are controlling. Specifically, Article XII, paragraph C reserved to the appel-lants

> "the right to alter, modify, build upon or change *all Common Elements* ... until such time as a final amendment to the Declaration and final Plat, both designat-ed as such, have been recorded. Prior to recordation of such final amendment and final Plat, no person whatsoever shall have any right to object to or in any way contest any alteration, modification, or change to any of the Common Elements ... resulting from ... [the appellants'] rights and privileges (i) [sic] to construct additional Buildings containing Units or other improvements pursuant to this Ar-ticle XII, or (2) [sic] to amend the Decla-ration pursuant to Article XII hereof."

In conclusion, we hold that the trial court erred when it found that the reservation of development rights within the Racquet Club Condominium was ineffective as a matter of law and contrary to the provi-sions of A.R.S. §§ 33–551, et seq., and in awarding attorney's fees against appel-lants. Accordingly, the judgment is re-versed and the matter remanded for fur-

ther proceedings consistent with this opinion.

HOWARD and FERNANDEZ, JJ., concur.